UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Spencer Byrd, Allie Nelson, and Lewrance Gant, *Plaintiffs*, v. The City of Chicago, *Defendant*. | No. 19 CV 3691 Judge Lindsay C. Jenkins |

**ORDER**

Municipal Code of Chicago § 2-14-132 authorizes the City of Chicago to impound cars used in the commission of certain municipal violations, including driving without a valid license and drug offenses. Spencer Byrd, Allie Nelson, and Lewrance Gant, the only remaining Plaintiffs, each had their cars impounded under the Ordinance between 2016 and 2019. Through this lawsuit, they allege that the City's then-existing impoundment scheme violates state and federal law.

After some claims were dismissed in 2020, the parties proceeded with discovery and in 2024, the Court denied Plaintiffs' motion for class certification. [Dkts. 54, 160.] Count One alleges that the Ordinance violates the Proportionate Penalties Clause of the Illinois Constitution; Counts Three and Four allege that the Ordinance violates procedural due process under the United States and Illinois Constitutions. [Dkt. 29.][1] For the reasons that follow, the City's motion for summary judgment is granted in full and Plaintiffs' motion is denied.

*Statement of Undisputed Material Facts*

The Court "present[s] the facts ... in the light most favorable" to the nonmovant. *Emad v. Dodge Cnty.*, 71 F.4th 649, 650 (7th Cir. 2023). The Court only relays facts that are material. That is, "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Ordinance § 2-14-132, the City of Chicago is authorized to impound cars used in connection with certain enumerated offenses including possessing narcotics, driving with a suspended or revoked license, driving while intoxicated, possessing unlawful firearms, and drag racing. [Dkt. 196, ¶ 9.] When a car is impounded under the Ordinance, the City assesses a towing fee, daily storage fees, and administrative

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

penalties (which the parties also refer to as fines) against the registered owner. [Dkt. 187, ¶ 8]. The amount of the penalty assessed against the owner depends on the nature of the underlying offense. *See* § 2-14-132(a)(1). The fines and fees for towing or storage attach to owners *in personam*. [Dkt. 187, ¶ 9.]

Within ten days of impoundment, the City is required to mail a notice of impoundment to the car's owners and lienholders. [Dkt. 196, ¶ 15.] The City uses Law Enforcement Agencies Data System (LEADS) to access Illinois Secretary of State records concerning driver's license and car registration information to determine the name and address of a car's owner. [*Id.*, ¶ 14.] After a car is impounded, its owner has fifteen days to request an initial probable cause hearing before the Department of Administrative Hearings; if requested, the hearing would occur within two business days of the request. [*Id.*, ¶ 21.] At these initial hearings, the City bears the burden to establish probable cause to believe that the car was used in a violation subjecting it to impoundment. § 2-14-132(a)(1). If the City meets its burden, it continues to hold the car until the owner pays the applicable fines and fees, or until the owner prevails at a full merits hearing on the validity of the impoundment. [§ 2-14-132(a)(1), (b)(3)(B); Dkt. 196, ¶ 21.] If the City does not meet its threshold burden, the car is returned "without penalty or other fees." [§ 2-14-132(a)(3); Dkt. 196, ¶ 21.]

Owners who do not seek an initial probable cause hearing or who do not prevail at the probable cause hearing can challenge the impoundment at a full merits hearing before the Department of Administrative Hearings. [*Id.*, ¶ 24; § 2-14-132(b)(3).] At a merits hearing, the City must establish by a preponderance of the evidence that the car was used in the violation subjecting it to impoundment [*Id.*] If the City meets this burden, the owner is fined in an amount that corresponds to the underlying violation and is assessed fees for towing and storage. [*Id.;* § 2-14-132(b)(3)(A).] If the City fails to meet this burden, the car is returned to its owner and any fines or fees the owner already paid are refunded. [Dkt. 196, ¶ 27; § 2-14-132(b)(3)(B).] The outcome of the administrative hearing is appealable to the Circuit Court of Cook County. [Dkt. 196*,* ¶¶ 26–27.] Once a final judgment of liability is entered against the car's owner, he or she has at least forty-five days to pay outstanding fines and fees to reclaim the car. [*Id.*, ¶ 27; § 2-14-132(d).] If the owner does not do so, the car is subject to disposal.

At the time of the impoundments at issue in this case, the Ordinance did not permit owners to avoid liability at a full merits hearing by showing that a court had dismissed the underlying criminal violation. [Dkt. 187 at ¶ 24.] Nor could owners avoid liability at a full merits hearing by showing that he or she was not legally responsible for the underlying offense, such as by showing he or she did not

participate in the offense or did not know or have reason to know that illegal conduct was likely to occur. [*Id.*][2]

Cars held by the City at an impound lot may also be subject to forfeiture proceedings by the State of Illinois. State and City forfeiture proceedings occur independent of one another although they often happen concurrently. [Dkt. 196, ¶¶ 31–32.] A favorable outcome after an administrative hearing under the Ordinance does not automatically result in a car's release if state forfeiture proceedings are ongoing. [*Id.*] In connection with state forfeiture proceedings, an owner who establishes to a judge that he or she will suffer a hardship if the car is not released while forfeiture proceedings are ongoing and who alleges that the hardship was not due to the owner's "culpable negligence" can seek the car's release. [*Id.*, ¶ 33 (quoting 720 ILCS 5/36-1.5(e)).] Absent this showing, the car will not be released during state forfeiture proceedings. [*Id.*]

*Spencer Byrd*

In June 2016, Spencer Byrd's Cadillac was impounded following a traffic stop where CPD officers discovered that Byrd's passenger, Timothy Mars, possessed suspected heroin. [Dkt. 196, ¶ 65.] Mars had requested Byrd's assistance with mechanical work Mars needed on his car. [*Id.*, ¶ 66.] Byrd tried to help, but when he could not make the repair, Byrd agreed to give Mars a ride even though the two did not know each other well. [*Id.*, ¶ 68.] Byrd was pulled over by CPD officers for a malfunctioning turn signal. [*Id.*, ¶ 69.] During the stop, officers noticed Mars repeatedly reaching into his pants pocket and found suspected heroin on Mars during a pat down. [*Id.*, ¶ 70.] Mars was arrested and CPD drove Byrd to a police station where they later released him. Officers told Byrd that his car had been impounded and provided paperwork explaining how to initiate the administrative hearing process. [*Id.*, ¶ 71.] The City also sent Byrd an impound notice to his home address, and there is no dispute that Byrd received the notice. [*Id.*, ¶ 72.] The State also initiated forfeiture proceedings against the Cadillac. [*Id.*, ¶ 73.] Byrd filed a hardship request with the court and that request was granted. [*Id.*]

Six months after impoundment, Byrd sought an administrative hearing. The request for a hearing was granted even though the request was made more than fifteen days after impoundment. [*Id.*, ¶ 74.] At the December 2016 hearing, the administrative hearing officer found probable cause to support the impoundment. [*Id.*] Byrd's full merits hearing occurred the following February, and Byrd was found liable for the drugs in the car. He was assessed a $2,000 penalty. [*Id.*, ¶ 75.] Byrd appealed the findings to the Circuit Court of Cook County, and the court affirmed the

---

[2] It is undisputed that the current ordinance allows owners to avoid liability where, for example, the underlying criminal violation was dismissed or where the owner was not legally responsible for the offense, did not participate in the offense, and did not know or have reason to know that the illegal conduct was likely to occur. [Dkt. 187, ¶ 25; § 2-14-132(h)(4), (h)(5).]

3

$2,000 fine against Byrd but reduced the towing and storage fees from $15,790 to $0. [*Id.*, ¶ 76.] Byrd's Cadillac remains in a City impound lot. [*Id.*, ¶ 77.]

*Allie Nelson*

In October 2017, Allie Nelson's Chrysler 300 was impounded after more than thirty grams of suspected cannabis were found in the car during a traffic stop. [*Id.*, ¶ 50.] The Chrysler was Nelson's secondary car that she permitted her teenage granddaughter and other family members to drive [*Id.*, ¶ 51.] Nelson instructed her granddaughter not to let her boyfriend, Jharad Tillis, drive the car. [*Id.*, ¶ 54.] At the time of the impoundment, Nelson was in Texas recuperating from medical treatments, and she had given her granddaughter instructions not to allow anyone else to drive the car. [*Id.*, ¶ 56.]

Nelson's car was stopped by CPD for a cracked windshield. [*Id.*, ¶ 57.] Tillis was driving and Nelson's granddaughter was in the passenger seat. [*Id.*] Officers discovered Tillis in possession of cannabis, he was arrested, and the car was impounded. [*Id.*] Six days after the stop, the City mailed a notice of impoundment to the LEADS address associated with Nelson's name. Nelson denies ever receiving this notice. [*Id.*, ¶¶ 59–60.]

In November, a default judgment was entered against Nelson. [*Id.*, ¶ 61.] Nelson moved to set that judgment aside, explaining that she never received the notice. [*Id.*] Even though more than twenty-one days had passed, the administrative officer granted the request and Nelson's full merits hearing was held in February 2018, where Nelson was found liable for the drugs in the car. [*Id.*, ¶ 62.] Nelson was assessed both a $2,000 penalty and $3,925 in fees. [*Id.*]

Nelson's car was also subject to State forfeiture proceedings. [*Id.*, ¶ 63.] Nelson made a hardship request to a court to have her car released, but the request was denied. [*Id.*] The City eventually transferred Nelson's car to the Illinois State Police, who sold it at auction. [*Id.*, ¶ 64.]³

*Lewrance Gant*

Lewrance Gant's Crown Victoria was impounded in March 2019. [*Id.*, ¶ 35.] Gant owned another car but loaned the Crown Victoria to Donald Salter about twice a month. [*Id.*, ¶ 36.] Salter had worked for Gant's business, South Side Livery, and

---

³ Nelson asserts that the City disposed of her car, arguing that the City did so "by transferring it to [] the Illinois State Police." [Dkt. 196, ¶ 64.] But the record evidence Nelson cites fails to dispute the fact that the City played no role in the disposal decision. [Dkt. 173-2 at 12, 21.] The cited testimony establishes that whether to dispose of a forfeited car at the conclusion of City forfeiture proceedings when the car is also subject to State proceedings is a decision made only by Illinois State Police, not the City. Because Nelson has failed to dispute this fact, it is deemed admitted.

4

Gant knew Salter drove without the necessary chauffer's license. [*Id.*, ¶ 37.] Weeks before the car was impounded, Gant asked to see Salter's driver's license, which Gant took a picture of, and which listed a March 4, 2019, expiration date. [*Id*, ¶ 39.] Though it is disputed whether Gant knew that Salter's license had been suspended, it is undisputed that Salter had outstanding tickets, that Gant knew Salter was on a "payment plan for tickets", and that Gant did not verify whether Salter had renewed his license on or after March 4. [*Id.*, ¶ 38.] On March 30, Salter was pulled over by CPD while driving the Crown Victoria. [*Id.*, ¶ 40.] Officers learned that Salter's license was suspended and they observed suspected cannabis in the back seat, so the car was impounded. Both "driving with a suspended or revoked license" and "unlawful drugs in vehicle" were listed as the reasons for impoundment. [*Id.*] Gant learned of the impoundment about an hour later when he received a call from Salter. [*Id.*, ¶ 41.] Gant went to the police station to meet Salter, and an officer explained that Gant's car had been impounded. [*Id.*, ¶ 42.] At the impound lot later that day, Gant learned that he needed to go to the administration hearing facility if he wished to have his car released. [*Id.*] The City mailed Gant an impound notification letter using LEADS. The letter described the process for challenging impoundment and said that an adverse judgment could result in the car's disposal. [*Id.*, ¶ 43.]

Gant requested an initial probable cause hearing, which was held on April 1, 2019. [*Id.*, ¶ 45.] The hearing officer found that the impoundment was supported by probable cause. [*Id.*] At the full merits hearing the following month, the City dismissed the "unlawful drugs" charge as a basis for the impoundment due to missing lab results, but Gant was found liable for the suspended license violation and was assessed a $1,000 penalty and $3,750 in fees. [*Id.*, ¶¶ 46–47.] Gant did not seek further review of the administrative decision, and he did not pay the penalty or fees. [*Id.*, ¶ 48.]

*Legal Standard*

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing cross-motions for summary judgment, all facts and reasonable inferences are construed in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted). But defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

5

*Proportionate Penalties Clause*

The Proportionate Penalties Clause of the Illinois Constitution provides that all "penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The parties first dispute whether the Ordinance falls within the scope of the Proportionate Penalties Clause. The City argues that the Clause regulates only criminal sanctions and because the Illinois Supreme Court has described the Ordinance as "presumptively civil", *see Linztzeris v. City of Chicago*, 216 N.E.3d 151, 164 (Ill. 2023), the Clause has no application to this case. [Dkt. 176 at 8.] For their part, Plaintiffs argue that fines are a penalty and, by its terms, the Clause applies to all penalties. [Dkt. 184 at 6 ("The most 'natural and obvious meaning' of 'all penalties' is that it includes every penalty, not just a subset of them." (cleaned up)).]

The Eighth Amendment's Excessive Fines Clause applies to civil and criminal penalties. *Grashoff v. Adams*, 65 F.4th 910, 916 (7th Cir. 2023) (an excessive fines inquiry "does not depend on whether the sanction arises in the civil or criminal context; 'civil sanctions can constitute punishment, and therefore are subject to the limitations of the Excessive Fines Clause, if they serve, at least in part, retributive or deterrent purposes.'") (quoting *Towers v. City of Chicago*, 173 F.3d 619, 624 (7th Cir. 1999)). Because the Illinois Supreme Court has interpreted the Proportionate Penalties Clause as "provid[ing] a limitation on penalties beyond those afforded by the eighth amendment," *see People v. Clemons*, 968 N.E.2d 1046, 1056–57 (Ill. 2012), the Court assumes for purposes of summary judgment that the Clause applies to civil penalties.

Plaintiffs raise a facial challenge to the Ordinance, but the Court decides the as-applied challenge first because if the as-applied challenge fails then the facial challenge necessarily fails. *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) ("principles of 'judicial restraint' counsel in favor of resolving 'as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary constitutional issues'" (citation omitted)). [Dkt. 54 at 19, n.6.]

A statute violates the Proportionate Penalties Clause if, as relevant here, the "punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Hilliard*, 234 N.E.3d 668, 674 (Ill. 2023) (cleaned up). Nothing specifies exactly what satisfies this standard because, as "society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* (quoting *People v. Miller*, 781 N.E.2d 300, 308 (Ill. 2002)). Like the Excessive Fines Clause, the relevant inquiry under the Proportionate Penalties Clause is whether a particular penalty was intended to punish. "Only governmental action that inflicts 'punishment' may be restricted by … the proportionate penalties clause." *People v. Avila-Briones*, 49 N.E.3d 428, 440 (Ill. App. Ct. 2015) (citing *People ex rel. Birkett v. Konetski*, 909

6

N.E.2d 783, 799 (Ill. 2009) ("Thus, the critical determination is whether imposition of the [sex offender] registration requirement is a direct action to inflict punishment.")

Plaintiffs argue that the Ordinance as applied violated the Proportionate Penalties Clause because the version in effect at the time of the impoundments punished them without regard for innocence or culpability for the underlying violation. [Dkt. 172 at 11–13; Dkt. 184 at 10–12.] They maintain that because "culpability is a cardinal consideration in the proportionality analysis," punishment without accounting for personal culpability was "necessarily disproportionate." [Dkt. 184 at 12.] The City responds that even under a theory of innocence, Plaintiffs still "bear some culpability for the misuse of their vehicles," because they at least enabled others to use their cars in a manner that violated the law. [Dkt. 195 at 10.] In support, the City relies on *Towers*, where the Seventh Circuit analyzed some of the same municipal ordinances at issue here and concluded that even owners who did not commit an underlying violation and had no reason to know of it still could be fined for the misuse of their cars. [*Id.* at 10–11; citing *Towers*, 173 F.3d at 620–26.] This, the City says, means that assessing fines against owners is not cruel, degrading, or wholly disproportionate.

In *Towers*, the Seventh Circuit evaluated an Excessive Fines Clause challenge to the City's ordinances allowing for impoundment and imposition of fines against car owners. *Towers*, 173 F.3d at 620. The car owners argued that $500 fines imposed on them were excessive because they "did not know about the illegal items that were found in their cars, they are innocent of any wrongdoing and, therefore, the fines imposed are excessive and grossly disproportional to the offense." *Id.* at 625. First, *Towers* concluded that the $500 fines were punitive and not solely remedial for Eighth Amendment purposes.

Next, the Court applied *United States v. Bajakajian*, 524 U.S. 321 (1998) to evaluate whether the penalty was "grossly disproportional to the gravity of [the] ... offense." 173 F.3d at 625. *Bajakajian* explained that the "touchstone of the constitutional inquiry ... is the principle of proportionality: The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish." 524 U.S. at 334, 337 (forfeiture of $357,144 was grossly disproportional to the gravity of Bajakajian's offense).[4]

Applying *Bajakajian*, *Towers* examined the gravity of the plaintiffs' conduct, noting that each had "unwittingly allowed his car to be used as a receptacle for another's illegal item," with no indication that the plaintiffs were involved in

---

[4] The *Bajakajian* factors "come from a case about criminal forfeiture—that is, a punishment tied to a conviction for a crime." *Grashoff*, 65 F.4th at 917. Like the Excessive Fines Clause, most claims under the Proportionate Penalties Clause arise in the criminal context, but "the same basic framework applies." *Id.*

7

anything illegal. 173 F.3d at 625. But the Court explained that even unwitting owners can still be held responsible for allowing their cars to be misused. It explained:

> We cannot accept, however, the notion that the plaintiffs must be considered completely lacking in culpability. The district court concluded, reasonably, that, because the plaintiffs did not report their cars stolen, they must have given some degree of consent to the use of their cars by others, either before or after that use. The district court further concluded, persuasively, that, when an owner consents to release control of his or her vehicle to another person, expressly or otherwise, the owner also accepts the risks inherent to that loss of control.

*Id.* (cleaned up). The harm caused by the plaintiffs' acts is "certainly a real and a legitimate subject of the City's concern," and by facilitating illegal activity, the Court said, the "plaintiffs have contributed, however unwittingly," to the spread of crime in the community. *Id.*

Finally, the Court concluded that $500 was "not so disproportionate to the gravity of the conduct" under the Excessive Fines Clause because "in fixing the amount, [the City] was entitled to take into consideration that the ordinances must perform a deterrent function—to induce vehicle owners to ask borrowers hard questions about the uses to which the vehicle would be put or to refrain from lending the vehicle whenever the owner has a misgiving about the items that might find a temporary home in that vehicle." *Id.* at 625–26. As such, the fine was large enough to function as a deterrent, but not so large as to be grossly out of proportion with the need for deterrence. *Id.*

More recently, the Illinois Supreme Court incorporated aspects of *Towers*' analysis when it considered whether § 2-14-132's imposition of fines on car owners was a valid exercise of the City of Chicago's home rule power. *Linztzeris*, 216 N.E.3d at 162. That analysis underscored that imposing an impoundment penalty serves "as a legitimate deterrence tool related to its interest in the safety and welfare of its residents." *Id.* at 162–63.

Plaintiffs argue that *Towers*' analysis is not controlling because (1) it did not involve a challenge under the Proportionate Penalties Clause, which necessarily requires consideration of rehabilitative objectives; and (2) the penalties at issue here, $2,000 for Byrd and Nelson and $1,000 for Gant, are substantially higher than the $500 fines in *Towers*. [Dkt. 172 at 16–17.]

It is true, of course, that *Towers* did not directly raise a Proportionate Penalty Clause challenge. Though the Illinois Supreme Court has interpreted the Clause as sweeping broader than the Eighth Amendment, the Seventh Circuit's analysis of whether the same statutory scheme under nearly identical facts is grossly

8

disproportionate to the underlying activity undoubtedly informs the proportionality analysis under the Illinois constitution. In this regard, Plaintiffs argue that "the conduct that the court determined in *Towers* that the City was permitted to deter is wholly absent here," because the factual record reveals that Byrd, Nelson and Gant all engaged in "due diligence." [Dkt. 172 at 17–18.]

Plaintiffs understandably disagree with *Towers*' excessive fines analysis, *see* dkt. 184 at 8 n.1, and with its application to the facts of this case. They are free to direct their arguments on this score to the Seventh Circuit. But this does not permit the Court to disregard *Towers* and its conclusion that the impoundment penalties serve a "legitimate deterrence" purpose, even if the car's owner "unwittingly" allowed his or her car to be used. 173 F.3d at 625 ("The City certainly has a right to sanction a vehicle owner who does not ensure that others with access to the vehicle do not place illegal items in it.") (citing *Bennis v. Michigan*, 516 U.S. 442, 447–48 (1996)). Here, it is not disputed that Byrd, Nelson and Gant each gave others access to their cars at one point or another, and that the underlying violations followed. [Dkt. 196, ¶¶ 35–36, 51, 56, 68.]

Nor does the Court agree with the characterization that "rehabilitative considerations" are lacking in *Towers*. As discussed, *Towers* explained the City's interest in inducing owners to inquire of borrowers before handing over their keys serves a legitimate deterrent function. 173 F.3d at 626–27. And as the City argues, this serves the purpose of "inducing owners to exercise greater care in entrusting their property to others." [Dkt. 186 at 19; *Towers*, 173 F.3d at 623.] Indeed, both Gant and Byrd testified that they take greater precautions when loaning out their cars. [Dkt. 196, ¶¶ 49,78.]

Second, Plaintiffs argue that *Towers* "comes out quite differently" because unlike the plaintiffs in *Towers*, the Plaintiffs here are "facing not hundreds, but thousands of dollars in penalties." [Dkt. 172 at 17.] "But the fact that over 13 years, the penalty under [the Ordinance] has increased from $500 to $2,000 does not, standing alone, pose any constitutional issues." *See Sloper v. City of Chicago, Dep't of Admin. Hearings*, 23 N.E.3d 1208, 1215 (Ill. App. Ct. 2014). Surely, fines can increase between 1999 and 2016 without automatically triggering proportionality concerns.

Finally, the City argues that Plaintiffs' as-applied challenge fails because the undisputed facts establish that each Plaintiff either had reason to know their cars likely would be misused or failed to take precautions against that misuse. Specifically, (a) Gant allowed Salter to drive his Crown Victoria, even though Gant knew Salter often drove liveries without proper licensure and had many unpaid tickets (dkt. 196, ¶¶ 37–38); (b) Nelson permitted her granddaughter to use the Chrysler even though she assumed that her instructions not to let Tillis drive it would be ignored (*id.*, ¶ 54); and (c) Byrd allowed Mars into his car without inquiring whether Mars was carrying contraband. (*id.*, ¶¶ 67–68). [Dkt. 176 at 10–12.] According to the City, this means that Plaintiffs were not "innocent."

Plaintiffs do not dispute these facts. [Dkt. 184 at 12–14.] Instead, they argue that these circumstances are post hoc justifications developed through discovery and that regardless, the Ordinance in effect at the time of the impoundments did not allow owners to avoid liability by presenting an "innocence" defense. § 2-14-132(h)(4), (5). [Dkt. 184 at 11–14.] But as Plaintiffs themselves point out, culpability is a central consideration in the proportionality analysis, s*ee id.* at 11–12, so the Court agrees they factor into whether the fines are wholly disproportionate.

*Towers* held that even unwitting owners whose culpability "is not high" but who provided some degree of consent to the use their cars by others may still be held responsible for misuse of their property under the Excessive Fines Clause. *Towers*, 173 F.3d at 625–26. This was because the $500 fine imposed was not grossly disproportionate to the gravity of the activity that the City sought to deter. Bearing that holding in mind, the amounts assessed here—$1,000 for Gant and $2,000 each for Byrd and Nelson—while punitive and certainly not small sums, are not "cruel, degrading, or so wholly disproportionate" to the seriousness of the conduct sought to be deterred. They do not "shock the moral sense of the community." *Hilliard*, 234 N.E.3d at 673–74. The Court grants summary judgment for the City on Count One.

*Procedural Due Process (Prepayment of the Fine)*

Plaintiffs next challenge the payment requirements as a condition for releasing their cars. Specifically, they argue that the City's requirement that an owner pay the outstanding fines and fees before final judgment is rendered violates procedural due process. [Dkt. 172 at 18–19.][5]

The parties disagree on what procedural due process framework applies to this claim. Plaintiffs argue that *Fuentes v. Shevin*, 407 U.S. 67 (1972) applies, but the Court does not agree. *Fuentes* involved challenges to writs of replevin, which allowed the state to seize property without a hearing on behalf of third-party nonstate actors. *Id.* at 80. In those circumstances, the Supreme Court explained that notice and a hearing "must be granted at a time when the deprivation can still be prevented." *Id.* at 81. The factual circumstances here, however, are distinct enough to fall beyond *Fuentes*. Rather than seizure on behalf of private creditors, Plaintiffs' cars were impounded and subject to forfeiture proceedings by the City, and in the case of Nelson and Byrd, also by the State of Illinois. [Dkt. 196, ¶¶ 40, 63–64, 73–76.]

*Culley v. Marshall* involved plaintiffs whose cars had been used in connection with drug offenses who alleged that state officials violated their due process rights by retaining their cars during the forfeiture process without holding preliminary hearings. 601 U.S. 377, 381 (2024). Under Alabama law, cars used to commit or

---

[5] The City frames this claim as one of substantive due process, but the Court does not agree. Plaintiffs' "dispute is not (primarily) with that hearing process, but that the City's coercive imposition of a financial penalty occurs *before* that process results in final judgment." [Dkt. 184 at 18 (emphasis in original).]

10

facilitate drug crimes could be subject to civil forfeiture, "so long as the State then 'promptly' initiated a forfeiture case." *Id.* "[B]efore the forfeiture hearing, the car's owner could recover it by posting bond at double the car's value." *Id.* Alabama allowed an innocent owner affirmative defense at forfeiture hearings, where an owner could prevail and recover the car by establishing that the owner "lacked knowledge of the car's connection to the drug crime." *Id.* The Supreme Court concluded that "historical practice in civil forfeiture proceedings" and prior precedent established that in "civil forfeiture cases involving personal property such as cars, the Due Process Clause requires a timely forfeiture hearing but does not require a preliminary hearing." *Id.* at 392.[6]

*Culley* held that due process is satisfied with a timely, meaningful hearing. The process here easily satisfies that requirement because it contemplates both a probable cause hearing and a final merits hearing. [Dkt. 196, ¶¶ 21, 24.] A car's owner has fifteen days to request a probable cause hearing, and the hearing will occur within two business days of the request. [*Id.*, ¶ 21.] Both Byrd and Gant requested preliminary hearings and received them quickly. [*Id.*, ¶¶ 43–45, 74.] Although the final merits hearings took a bit longer, Plaintiffs do not seriously challenge the *timeliness* of the hearings they received.[7] The procedures satisfy *Culley*.

Even if, as Plaintiffs argue, *Culley* did not control, *Mathews v. Eldridge*, 424 U.S. 319 (1976), and its three-prong framework also support granting summary judgment to the City. Under *Mathews*, a procedural due process claim requires the Court to consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. The Court addressed *Mathews* at the pleadings stage and concluded that Plaintiffs stated a claim for procedural due process based on lack of pre-deprivation process. [Dkt. 54 at 23, 26.] With the benefit of fact discovery, the parties have refined their *Mathews'* arguments, which the Court addresses below.

---

[6] As Plaintiffs note, the asset forfeiture at issue in *Culley* attached *in rem* to the property itself, as opposed to this case where the fines and fees levied by the City attached *in personam* to the Plaintiffs. Still, the Seventh Circuit has explained that any distinction between *in rem* forfeitures and *in personam* fines is one of form, not substance. Both proceedings result in an economic penalty to the owner because property was used improperly; and both serve the same governmental purpose of deterring unlawful conduct. *Towers*, 173 F.3d at 626–27.

[7] Neither party raises *timeliness* arguments like those at issue in *United States v. $8,850*, 461 U.S. 555, 556 (1983) or *United States v. Von Neumann*, 474 U.S. 242, 251 (1986), which addressed whether the delay deprived individuals of due process. Because the parties did not squarely raise issues of delay, the Court does not use the framework applied in those cases, as first articulated in *Barker v. Wingo*, 407 U.S. 514 (1972).

First, in general, the private interest in one's car is substantial. [Dkt. 54 at 22.] Undoubtedly, "vehicle forfeitures are economically painful. Many Americans depend on cars for food, school, work, medical treatment, church, relationships, arts, sports, recreation, and anything farther away than the ends of their driveways." *Washington v. Marion Cnty. Prosecutor*, 916 F.3d 676, 679 (7th Cir. 2019). But the claim at issue here is not about permanent deprivation. Rather, Plaintiffs' claim relates to "the City's coercive imposition of a financial penalty [] *before"* final judgment. [Dkt. 184 at 18 (emphasis in original).]

Here, the length of prehearing deprivation varied for each Plaintiff. Gant and Byrd received probable cause hearings within two to twelve days of seeking them. [Dkt. 196 ¶¶ 45, 74.] Similarly, the length of time between impoundment and final merits hearing differed for each Plaintiff and ranged from about four to eight months. [*Id.*, ¶¶ 35, 46–47, 50, 61–63, 65, 74–75.] Although Plaintiffs have a strong private interest in their cars, even for a short period, in context, none of the deprivations was extraordinarily long. This factor favors Plaintiffs.

Second, the risk of erroneous deprivation and other procedural safeguards favor the City. To guard against the risk of an erroneous deprivation pending a final merits hearing, the City implements probable cause hearings, which can be requested within fifteen days of impoundment, and will be held within two business days of the request. [Dkt. 196, ¶ 21.] As explained, the City bears the burden of showing probable cause to believe the car was used in violation of the code. [*Id.*, ¶¶ 21, 24.] These procedural protections reduce the risk of erroneous deprivation by ensuring a probable cause hearing occurs soon after impoundment and that the deprivation continues only where there is probable cause. Of course, there remains some risk of an erroneous deprivation, *see* dkt. 54 at 23, and the procedures hardly guarantee perfect protections, but they certainly reduce the risk of erroneous deprivations. *See also People v. One 1998 GMC*, 960 N.E.2d 1071, 1093 (Ill. 2011) (noting that even under a *Mathews* analysis, the risk of erroneous deprivation was minimal in cases where a car was seized "simultaneously with" a driving under the influence or revoked license offense for which the police must have probable cause).

As to the final factor, at the dismissal stage, the Court concluded that the City's interest in ensuring prompt collection of monies owed did not outweigh Plaintiffs' interest in the use of their cars and in retaining access to their money, particularly since any judgment ultimately attached to individuals, independent of whether they have their cars. [Dkt. 54 at 23-24 (noting that the City had not addressed *Mathews*).] Now, the City focuses its argument on the City's interest in deterring serious offenses that present a risk to public health and safety, which *Towers* acknowledged as a legitimate government interest in the excessive fines context. [Dkt. 176 at 24; Dkt. 195 at 23-24; 173 F.3d at 625–26.]

Plaintiffs respond that demanding prepayment of a penalty that is not yet final has no constitutionally sound justification and is not "directly necessary" to securing

a governmental interest. [Dkt. 172 at 20–21.] And they reiterate that depriving car owners of their cars creates a negative feedback loop. [Dkt. 184 at 19 (citing *City of Chicago v. Fulton*, 592 U.S. 154, 164 (2021) (Sotomayor, J., concurring) (observing that an owner who lacks "reliable transportation to and from work, finds it all but impossible to repay her [bankruptcy] debt and recover her vehicle")).]

Ultimately, the third factor tips in favor of the City. As discussed at length above, *Towers* recognized the City's meaningful deterrent interest under the relevant ordinances, even for unwitting owners. As the City argues, Plaintiffs' proposal for releasing a car before fines are paid would negate much of the deterrent effect, rendering impoundment a "toothless sanction." [Dkt. 176 at 24.]

Lastly, the Supreme Court issued *Culley* in 2023, noting that requiring an additional preliminary hearing "would interfere with the government's important law-enforcement activities in the period after the seizure and before the forfeiture hearing." 601 U.S. at 388. As such, the Court cannot say that Plaintiffs' alternative approach—releasing cars without prepayment of fines or only requiring prepayment of fees but not fines—reduces the fiscal and administrative burden on the City. Under either analysis, summary judgment for the City on the procedural due process claim for prepayment of fines is granted.

*Procedural Due Process (Notice)*

Plaintiffs also bring a due process claim premised on insufficient notice that their cars were impounded or would be disposed of. The Ordinance requires that, "[w]ithin ten days after a vehicle is seized and impounded the Department of Streets and Sanitation or other appropriate department shall notify by certified mail the owner of record." § 2-14-132(b)(1)(A). The notice "shall state the penalties that may be imposed if no hearing is requested, including that a vehicle not released by payment of the penalty and fees and remaining in the City pound may be sold or disposed of by the City in accordance with applicable law." *Id.*

It is undisputed that Gant and Byrd both received notice of the impoundment of their cars and the potential for disposal. [Dkt. 196, ¶¶ 43, 71–72.] Only Nelson's notice claims remain, but no genuine dispute of material fact exists as to her.

Due process does not require actual notice. Rather, it "requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Johnson v. Purdue*, 126 F.4th 562, 566 (7th Cir. 2025) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)); *Krecioch v. United States*, 221 F.3d 976, 981 (7th Cir. 2000) (finding that "absent exceptional circumstances, written notice of forfeiture by certified mail to the claimant's residence satisfies due

process even if the claimant does not receive actual notice as a result.") Even plaintiffs who receive actual notice "may nonetheless challenge the procedural sufficiency of the notice." *Santiago v. City of Chicago*, 446 F. Supp. 3d 348, 357 (N.D. Ill. 2020); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13–15 (1978) (finding notice insufficient where customers of a utility company received notices that their services would be terminated but without information about how to object).

It is undisputed that the City sent a notice of impoundment to Nelson at the address on file with the Illinois Secretary of State. [Dkt. 196, ¶ 59.] Regardless of whether the notice the City sent to Nelson included all of the required information about impoundment *and* disposal, Nelson's due process claim concerns only whether she *received* that notice. [Dkt. 184 23–25.] But as discussed, actual notice is not required. *Purdue*, 126 F.4th at 566. Because due process only required that the City provide notice in a way reasonably calculated to apprise her, and because there is no dispute that the City did so, Nelson has not come forward with sufficient evidence to defeat summary judgment on notice of impoundment, even accepting her testimony that she did not receive the notice mailed to her.

Separately and finally, the parties dispute whether Nelson received notice regarding the potential for disposal of her car. Even assuming, as Nelson argues, that she never received the notice, and even if the notice did not include information about disposal of the car as she maintains, there is no dispute that Nelson participated in the process challenging the disposal. [Dkt. 196, ¶¶ 61–62.] Still, even if she paid the fine and fees after the liability finding in favor of the City, this would not have secured the return of her property: it is undisputed that Nelson's car was also subject to state forfeiture proceedings. [*Id.*, ¶¶ 62–63.]

In an attempt to regain possession from the state, Nelson submitted a hardship request, but that request was denied by a judge. [*Id.*] Thus, any dispute about whether Nelson received proper notice of disposal from the City is ultimately immaterial because her car was disposed of by the State of Illinois, not the City, a fact Nelson has not disputed. [*Id.*] Summary judgment is therefore appropriate in favor of the City.

*Conclusion*

For the reasons stated above, the City of Chicago's motion for summary judgment is granted in full. Plaintiffs' motion for summary judgment is denied in full.

Enter: 19 CV 3691
Date: March 27, 2025

_____
Lindsay C. Jenkins
United States District Judge